## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF NORTH DAKOTA

| | |
|---|---|
| In Re: Michael J. Peluso, <br><br> Debtor. | Bankruptcy No. 17-30413 <br> Chapter 7 |
| Gene W. Doeling, <br> As Bankruptcy Trustee, <br><br>    Plaintiff, <br><br> vs. <br><br><br> Michael J. Peluso, <br><br>    Defendant. | <br><br><br> Adversary No. 17-7023 |

## MEMORANDUM AND ORDER

### I.    INTRODUCTION

Gene W. Doeling, Chapter 7 Trustee, filed a Complaint seeking a denial of Debtor/Defendant Michael J. Peluso's discharge under 11 U.S.C. § 727(a)(2) and (4). The Trustee alleges that Debtor: (1) transferred funds to his mother prepetition and postpetition with the intent to hinder, delay or defraud creditors; and (2) knowingly and fraudulently made false oaths or accounts in connection with this case by failing to disclose the transfers to his mother and assets he owned on the date of petition. Doc. 1.

Debtor filed an Answer to the Complaint, asserting that: (1) he did not transfer assets to his mother but simply gave her authority to disperse Debtor's funds as he directed; and (2) any omissions were inadvertent, unintentional and based on "nominal oversights." Doc. 4 at 3.

For the following reasons, the Court finds in favor of the Trustee and orders that Debtor is denied a discharge.

## II.    FACTS

### A.    Debtor's Failed Business Venture

In 2011, Debtor purchased and became the sole owner of RJKL Corporation. RJKL operated Zachmeier Manufacturing, which constructed boat docks and ice fishing houses.  Debtor purchased RJKL from Russell and Jennifer Smith, who previously purchased it from Leo Zachmeier and Tony Wald.  Debtor was not represented by counsel in connection with his purchase of RJKL.

After purchasing RJKL, Debtor discovered many challenging issues with the business.  Debtor claimed the previous owners left a "lot of loose ends" as well as "ratty books so it was hard to get a good grip on what was actually there and what wasn't." According to Debtor, he "assumed liabilities of hundreds of thousands of dollars" under the purchase agreement with the Smiths.  He also assumed responsibility for building $100,000 in docks to fulfill prior commitments made by the Smiths.

Adding to these difficulties, the Missouri River flooded Bismarck in 2011 which affected both the business and Debtor personally.

Debtor addressed these challenges by seeking professional advice from accountants and bankers.  He discontinued the dock business and focused on manufacturing ice fishing houses.  He reduced the number of employees to streamline the business and minimize overhead, and he performed "lots of work on his own dime." Despite his efforts, Debtor "never could gain traction."  The business was never profitable while Debtor owned it.  Ultimately, Debtor could not save the business.

Debtor did not operate the business in the year and a half prior to July 5, 2017, the date he petitioned for bankruptcy relief.

Attorney LaRoy Baird, who represented Debtor in his bankruptcy case, testified at the trial in this case. Attorney Baird characterized Debtor's purchase of the business as a "terrible decision." The business owed large debts when Debtor purchased it, and Debtor assumed this debt. Debtor then personally guaranteed additional debt trying to keep the business operating.

At some point, Debtor could no longer make the payments for his purchase of the business. Zachmeier and Wald sued the Smiths, who commenced a third-party action against Debtor. Ex. 6. On June 13, 2017, Zachmeier and Wald obtained an amended judgment in state court against the Smiths. Ex. 6. The court found that Debtor "contractually agreed to indemnify and hold Smiths harmless with respect to any financial obligations of RJKL, including the Promissory Note" signed by the Smiths when they purchased the business from Zachmeier and Wald. Ex. 6. Accordingly, the state court found Debtor liable to the Smiths for $232,147.65, the total sum of the judgment awarded to Zachmeier and Wald, plus interest. Id. The court also found Debtor liable for the Smiths' attorney's fees and costs totaling $48,205.28. Id. To satisfy the judgment, the Smiths pursued a wage garnishment against Debtor.

**B.    The Months Before Bankruptcy: The Edward Jones Account and Fishing Guide and Tournament Earnings**

After he stopped operating his dock and fish house manufacturing business, Debtor held various jobs. In the summer of 2017, Debtor competed in professional fishing tournaments and worked as a fishing guide on Devils Lake for Perch Eyes Outfitters in addition to his regular employment as a substitute teacher and instructional

aid for handicapped students.  He did not have a set schedule as a fishing guide.

Instead, Jason Feldner, the owner of Perch Eyes, contacted Debtor as needed.  The

fishing clients paid Perch Eyes, and Feldner paid Debtor.  Feldner left checks for Debtor

and the other guides in the Perch Eyes shop, and the guides "fetched them" at their

convenience.

On the summer of 2017, Debtor owned two Edward Jones accounts opened in

2004 through his previous employment.  Only one of the accounts was a qualified

retirement account.  Prior to June 2017, he did not withdraw any funds from the

accounts.

On June 2, 2017, Debtor withdrew the full balance of funds in the account that

did not qualify as a retirement account.[1]  Ex. 1 at T-3.  Edward Jones mailed Debtor a

check in the sum $15,258.24 which Debtor received a few days later.  Although Debtor

held a business account at American Bank Center, he did not deposit the proceeds into

this account, add his mother's name to the American Bank Center account or open a

new account under his name.  Instead, he endorsed the check, gave it to his mother

and asked her to pay his bills with the proceeds.  Debtor also gave his mother an

$800.00 check he had recently earned either as a fishing guide or received as a prize

for winning a fishing tournament and asked her to pay bills with this money as well.

Debtor gave his mother a handwritten list of bills to pay, including his mortgage, taxes,

child support and Attorney Baird's fees.  Ex. 106.

---

[1] At trial, Debtor explained that he knew he had different accounts but was not
sure what type of accounts they were.  He conceded, however, that an Edward Jones
employee advised him that he could use the money in the account that did not qualify
as a retirement account to pay his bills.

Debtor claims he asked his mother to pay his bills because he was out of town during most of this period either competing in fishing tournaments or providing guide services.  According to his mother, Debtor was trying to make enough money to pay his mortgage and child support obligations.  Debtor, who was newly divorced at the time, depended on his mother to ensure his bills were paid.  Debtor wanted to pay his bills and knew his mother—whom Debtor characterized as "like a secretary" for him—would do it for him.

Debtor's mother opened a checking account in her name only at Kirkwood Bank & Trust on June 21, 2017.  Ex. 9.   She explained that she opened the account because she did not want Debtor's money in her personal account.  She felt she could be "accountable" for the money if she used a separate account.  She deposited the two checks in the sums of $800.00 and $15,258.24 on June 21, 2017, and another check for $800.00 from guide services on July 6, 2017.  Ex. 9 at T-46.  According to a hand-written ledger she kept, Debtor's mother wrote 14 checks on June 26, 2017, leaving $4,696.84 in the account.  Ex. 118.  Debtor's mother did not use any of the money for personal expenses or purchases.  She insisted neither she nor Debtor were trying to hide the money; they were just trying to pay his bills.

Debtor's mother confirmed that Debtor was rarely in Bismarck at that time and explained that she opened the account in her name only because she signed all the checks.  Although Debtor was not named on the account and was not granted signature authority for it, Debtor's mother gave him the debit card for the account when Kirkwood Bank sent it to her two weeks after she opened the account.  Debtor began using the

5

debit card for purchases on July 2, 2017.  Ex. 9.  He was the only person who used the debit card for purchases.

### C.    Debtor's Statements on His Bankruptcy Schedules and SOFA

Debtor filed a voluntary petition for bankruptcy relief under Chapter 7 of the Bankruptcy Code on July 5, 2017.  Debtor understood that he was required to disclose all his assets and "spent quite a bit of time" reviewing the information in his bankruptcy petition before signing it.  Despite acknowledging his duty to disclose, Debtor omitted assets from his schedules, including a trolling motor, a depth finder, a portable ice house, an auger, a golf cart, archery equipment and income from fishing guide services and fishing tournaments.

Debtor also failed to disclose the liquidated Edward Jones investment account or its proceeds on his schedules.  Although he properly listed the Edward Jones IRA account valued at $10,032 on his Statement of Financial Affairs (SOFA) under the question related to retirement or pension accounts, he neglected to disclose the other Edward Jones account or the proceeds which were deposited in the Kirkwood Bank account.[2]  On the question on the schedules referring to "Deposits of money," Debtor explained that he listed only the checking account at American Bank Center with a balance of $181.79 because it was his only account.  He claimed he did not list the Kirkwood Bank account because, "It was my money, but in my mind, it was not my money because it was all going towards child support, house payments, insurance, bills, all that stuff."  Pushed for clarification about whether it was his money, Debtor again

---

[2] Debtor did not tell Attorney Baird that he liquated the Edward Jones account and gave the proceeds to his mother to pay his bills until sometime after he petitioned for bankruptcy relief.

acknowledged it was his money and that he knew it was deposited in the Kirkwood

account.  The balance in the Kirkwood Bank account in his mother's name on the date

of petition totaled $6,361.89.  Ex. 9 at T-43.

Likewise, Debtor gave incorrect or, at the very least, misleading answers to the

following questions on the SOFA:

> Within 2 years before you filed for bankruptcy, did you sell, trade, or
> otherwise transfer any property to anyone, other than property transferred
> in the ordinary course of your business or financial affairs?

Ex. 12 at 52.

> Within 1 year before you filed for bankruptcy, were any financial accounts
> or instruments held in your name, or for your benefit, closed, sold, moved,
> or transferred?  Include checking, savings, money market, or other financial
> accounts; certificates of deposit; shares in banks, credit unions, brokerage
> houses, pension funds, cooperatives, associations, and other financial
> institutions."

Ex. 12 at 53.

Debtor answered, "No" to both questions.  Id.  He testified that these answers

were correct even though he gave the money from the Edward Jones account to his

mother, who deposited the proceeds in an account in her name for his benefit.  Debtor

also testified he was unaware that "cashing out" the Edward Jones account constituted

a sale that he must disclose under the second question listed above.  In response, the

Trustee directed Debtor's attention to the Edward Jones account statement.  Ex. 1.  The

statement shows that $14,252.38 of the money in the account was "Proceeds from

Securities Sold."  Ex. 1.  After the Trustee directed Debtor's attention to this statement,

Debtor reluctantly agreed that he sold securies, stating: "Technicality-wise, yes, but as

far as me thinking that way, no."

Schedule A/B asks debtors to list money or property owed to a debtor.  Debtor did not list any prepetition income or payments received for his fishing guide services on this schedule.  He left this answer blank even though his mother deposited a check for $800 for such services on the day after he filed his bankruptcy petition and even though he knew he was owed additional compensation for these services.  Ex. 9 at T-46.  Even though he testified about the dates and sums of fishing guide services checks at the continued meeting of creditors, during the trial Debtor was unable to specify the dates he provided fishing guide services and he did not know the sum Feldner owed him at the time he filed his bankruptcy petition. [3]  When asked whether he knew he was owed money, he answered, "Not necessarily," but he acknowledged that he had provided fishing guide services prepetition for which he had not been paid.

At the time Debtor filed his bankruptcy petition, he worked as a substitute teacher and instructional aid for handicapped children in addition to his fishing-related side jobs.  He coached hockey earlier in the year, but the season ended in February.  Ex. 8 at T-18.  On Schedule I of his petition, Debtor listed his occupation as "instructional

_____

[3] After Debtor filed for bankruptcy, Feldner emailed him a list of checks Feldner wrote to Debtor which Debtor forwarded to Attorney Baird and Attorney Baird forwarded to the Trustee.  Exs. 5, 102.  The first check was dated June 23, 2017, for $800.  Ex. 5.  Other checks dated prepetition included $1,200 on June 28, 2017, $500 on July 1, 2017, and $850 on July 4, 2017.  Ex. 5.  Feldner listed four postpetition checks with the last dated August 10, 2017.  Ex. 5.  The checks totaled $6,600, but Debtor testified that not all of them were issued to him; rather, approximately half of the checks were issued to other guides. Attorney Baird testified that Feldner's list of checks "turned out to be wholly inaccurate."  Specifically, the majority of the checks Feldner listed were to other guides and only between $800 and $1,200 of the checks were to Debtor.

At a second (continued) meeting of creditors in September 2017, Debtor admitted that Feldner wrote him checks for fish guiding services for $500.00 dated July 1, 2017, and for $850.00 dated July 4, 2017, and that he was holding the checks on the date he filed his bankruptcy petition.  Ex. 8 at T-34.

aid/coach" and his gross monthly income as $2,850.  Although Schedule I also requires debtors to disclose "other income regularly received," Debtor did not list his income from fishing guide services or tournaments.  At trial, he testified that he had no other income although he conceded that he provided guide services beginning the end of June.

In addition to omitting assets and information on his schedules, Debtor also undervalued fishing rods and reels.  In his schedules, Debtor listed a value of $100 for this equipment but later provided the Trustee an itemized inventory of rods and reels in his possession with a total value of $1,325.  Debtor explained that he only included items he owned on his schedules.  He claims that most of the rods and reels in his possession were Scheels' property, which it provided to him through a sponsorship agreement.  He maintained Scheels could take them back at any time, and he could not sell them.

### D.   Debtor's Statements at the Meeting of Creditors and Continued Meeting of Creditors and His Explanations at Trial

The Trustee conducted the meeting of creditors on August 24, 2017, approximately seven weeks after Debtor filed his bankruptcy petition.  Before the meeting began, Attorney Baird raised the issue of the Edward Jones account with the Trustee.  Specifically, Attorney Baird told the Trustee that Debtor's 2015 tax return indicated Debtor earned interest income.  Attorney Baird told the Trustee that he suspected the interest income was from the Edward Jones account and that he was looking into it.

According to Attorney Baird, Debtor had "no clue" where the interest came from. At trial, Debtor also asserted that he did not know what type of account it was at the time and that Attorney Baird was researching it, and he insisted he was not trying to

hide the money or the existence of the account.  During the meeting of creditors, Debtor

did not inform Attorney Baird or the Trustee that he gave the Edward Jones account

money to his mother, who deposited it into an account in her name.

At trial, the Trustee highlighted several statements Debtor made at the meeting

of creditors.  These statements, followed by Debtor's explanations for the statements,

are summarized below:

- His petition contained no errors or omissions to bring to the Trustee's attention.  Ex. 8 at 4.

- On the bankruptcy petition date, Debtor had not provided any guide services for which he had not been paid.  Ex. 8 at 7.  At trial, he testified he was not sure whether he had been paid all the money he was owed prior to his bankruptcy filing.  According to Debtor, "It's all jumbled together."  Debtor also acknowledged at trial that he earned cash prizes from fishing tournaments in 2017, but he was not sure how much he was owed on the petition date.  He estimated, "It wouldn't have been enough to pay much of this stuff. . . .  I would need a lot more than the couple grand that I possibly could win throughout the summer fishing in tournaments.  So, anything I had coming and going was strictly to try and pay the bills."

- He did not give away or transfer any property or assets to anyone else, including during the 90 days before he filed bankruptcy.  Ex. 8 at 17.  At trial, he explained that he did not think that giving his mother the check from the Edward Jones account was giving away or transferring any of his property because he was using it to pay bills.  He explained, "It was there, but it wasn't there."

- He did not give away or transfer any of his assets or property to any family members, relatives or good friends in the last couple years. Ex. 8 at 17.  At trial, he explained that the transfer to his mother did not occur to him.

- He took money out of the Edward Jones account to pay his bankruptcy attorney's fees and to make two mortgage payments ("I needed money to start paying stuff so I didn't lose it, and I knew I could—that was the only thing I had left.").  Ex. 8 at 34.  At trial, he explained he did not disclose these transfers "because I was just trying to pay bills."

- He owns a depth finder that he bought in high school that does not work well.  Ex. 8 at 31.  At trial, he explained that he did not list it on his

schedules because he does not use it often, the screen is bad, and "it isn't worth anything."

- He owns a small portable ice house. Ex. 8 at 31. At trial, he explained that he did not list it on his schedules because he does not use it, and it is stored in his attic where mice damaged it. It is "full of holes" and Debtor opined that he "probably can't give it away."

- He owns an auger. At trial, he explained he did not list it on his schedules because it does not work and he is unsure where it is located. He believes it has no value.

- He owns a golf cart that he bought three years ago for "1,500 bucks, maybe" that he did not list on his schedules because "I was gonna just scrap it because it's—I'm sick of hauling it around. I don't—I don't think it's worth anything, to be honest with you." Ex. 8 at 39-40. At trial, Debtor was unable to recall when he bought the golf cart and estimated that he paid between $300 and $500 for it. He explained that he did not list the golf cart on his schedules because it does not run and "it needs to go to the dump."

- He owns archery equipment worth $100. Ex. 8 at 41. At trial, he explained that he owns a bow, but it is "junk" and "maybe worth $100."

On August 29, 2017, the Trustee sent Attorney Baird on behalf of Debtor a letter regarding the meeting of creditors. Ex. 101. In the letter, the Trustee requested documentation related to the Edward Jones accounts and Debtor's sale of his boat, an inventory of Debtor's hockey memorabilia, fishing rods and reels, and information regarding the garnishment against Debtor. Ex. 101. The Trustee also demanded that Debtor amend his schedules to include the golf cart. Ex. 101.

On behalf of Debtor, Attorney Baird responded to the Trustee by letter on September 21, 2017. Ex. 102. He enclosed an account statement for the nonretirement Edward Jones account and stated that "[Debtor] was unaware of this account until I obtained a copy [of the account statement]." Ex. 102. Attorney Baird acknowledged, however, that the statement showed a complete withdrawal of $15,258

11

from the account.  Ex. 102.  He also enclosed a statement for the Kirkwood Bank account opened in Debtor's mother's name.  Ex. 102.  He explained, "It was opened in her name to protect the funds from judgment creditors while we finished the bankruptcy filing," and "She wrote all of the checks and managed this account due to the Debtor's work activities out of town guiding in the Devils Lake area."  Ex. 102.  He informed the Trustee of the source of the funds and enclosed Debtor's mother's handwritten ledger documenting the checks she wrote.  Ex. 102.  Attorney Baird also provided additional information on each of the other topics/assets the Trustee requested.  Ex. 102.

At trial, Debtor insisted he did not know anything he said at the meeting of creditors was false, and he did not intend to defraud his creditors.  He eventually disclosed the Edward Jones account to the Trustee, and he provided the Trustee with all the documentation the Trustee requested.

### E.      Amended Schedules and SOFA

Debtor filed amended schedules and SOFA on March 23, 2018.  Stip. Facts, Doc. 15.  In the amended schedules, Debtor disclosed the Kirkwood Bank account, and the SOFA referenced the closed Edward Jones account and Debtor's receipt of $15,258.  Id.

## III.    CONCLUSIONS OF LAW

### A.      Jurisdiction

This adversary action is a core proceeding under 28 U.S.C. § 157(b)(2)(J).  The Court has jurisdiction under 28 U.S.C. §§ 1334 and 157 and authority to enter a final order in this matter.  This opinion constitutes findings of fact and conclusions of law in accordance with Federal Rule of Bankruptcy Procedure 7052.

B.    **Denial of Discharge Standards**

In the Complaint, the Trustee seeks a denial of Debtor's discharge under 11

U.S.C. § 727(a)(2) and (a)(4).  Section 727 of the Bankruptcy Code provides:

(a)    The court shall grant the debtor a discharge, unless . . .

(2) the debtor, with intent to hinder, delay, or defraud a creditor or an officer of the estate charged with custody of property under [the Bankruptcy Code], has transferred, removed, destroyed, mutilated, or concealed, or has permitted to be transferred, removed, destroyed, mutilated, or concealed—

(A) property of the debtor, within one year before the date of the filing of the petition; or

(B) property of the estate, after the date of the filing of the petition;

* * *

(4) the debtor knowingly and fraudulently, in or in connection with the case—

(A) made a false oath or account[.]

11 U.S.C. § 727(a).

Denying a debtor a discharge is a harsh remedy. Home Serv. Oil Co. v. Cecil (In

re Cecil), 542 B.R. 447, 451 (B.A.P. 8th Cir. 2015).  Accordingly, courts strictly construe

section 727 in favor of the debtor.  Id.  While this standard favors debtors, it is also true

that a discharge in bankruptcy and the associated fresh start are privileges, not rights.

Bauer v. Iannacone (In re Bauer), 298 B.R. 353, 357 (B.A.P. 8th Cir. 2003) (citing

Grogan v. Garner, 498 U.S. 279, 286 (1991)).  "The opportunity for a completely

unencumbered new beginning is limited to the honest but unfortunate debtor."  Id.  The

cost to the debtor for an unencumbered fresh start is minimal, but it includes honesty

and accurately disclosing his or her financial affairs and cooperating with the trustee.

Id.; see also 11 U.S.C. § 521 (listing a debtor's duties in bankruptcy).  "To prevail in an

action to deny a debtor's discharge, the objecting party must prove each element under
§ 727 by a preponderance of the evidence."  Kaler v. Charles (In re Charles), 474 B.R.
680, 683–84 (B.A.P. 8th Cir. 2012) (citing Allred v. Vilhauer (In re Vilhauer), 458 B.R.
511, 514 (B.A.P. 8th Cir. 2011; Fed. R. Bankr. P. 4005)).

   C.    **Denial of Discharge Under 11 U.S.C. § 727(a)(4)**

   Section 727(a)(4)(A) bars the entry of discharge if a debtor knowingly and
fraudulently made a false oath or account in or in connection with a case.  11 U.S.C. §
727(a)(4)(A).  To meet his burden under this subsection, the Trustee must prove that
"'(1) Debtor made a statement under oath; (2) the statement was false; (3) Debtor knew
the statement was false; (4) Debtor made the statement with fraudulent intent; and (5)
the statement related materially to Debtor's bankruptcy case.'"  In re Charles, 474 B.R.
at 684 (quoting Lincoln Sav. Bank v. Freese (In re Freese), 460 B.R. 733, 738 (B.A.P.
8th Cir. 2011)).  To prevail in an action seeking denial of discharge, the Trustee must
prove each element by a preponderance of the evidence.  Grogan, 498 U.S. at 289.

   Section 727(a)(4)(A) "'requires nothing less than a full and complete disclosure of
any and all apparent interests of any kind.  The debtor's petition, including schedules
and statements, must be accurate and reliable, without the necessity of digging out and
conducting independent examinations to get the facts."  In re Cecil, 542 B.R. at 453–54
(quoting Korte v. U.S. Internal Revenue Serv. (In re Korte), 262 B.R. 464, 474 (B.A.P.
8th Cir. 2001)); see Armstrong v. Lunday (In re Lunday), 100 B.R. 502, 508 (Bankr.
D.N.D. 1989) ("A debtor has an uncompromising duty to disclose whatever ownership
interest he holds in property."); Daniel v. Boyd (In re Boyd), 347 B.R. 349, 355 (Bankr.
W.D. Ark. 2006) (commenting that section 727(a)(4)(A) promotes veracity in the
statements and schedules to help prevent creditors and the trustee from resorting to

14

independent fact-finding and investigation).  "'The debtor's duty of disclosure requires updating schedules as soon as reasonably practical after he or she becomes aware of any inaccuracies or omissions.'"  In re Bauer, 298 B.R. at 357.

"Full disclosure is required, not only to ensure that creditors receive everything they are entitled to receive under the Bankruptcy Code, but also to give the bankruptcy system credibility and make it function properly and smoothly[.]"  In re Cecil, 542 B.R. at 454.  The disclosure requirement has implications beyond the administration of each individual bankruptcy case because "failure to comply with the requirements of disclosure and veracity necessarily affects the creditors, the application of the Bankruptcy Code, and the public's respect for the bankruptcy system as well as the judicial system as a whole."  In re Korte, 262 B.R. at 474 (quoting Nat'l Am. Ins. Co. v. Guajardo (In re Guajardo), 215 B.R. 739, 742 (Bankr. W.D. Ark. 1997)).

The Trustee argues that Debtor made multiple false oaths in his bankruptcy filings and at the meeting of creditors. Specifically, the Trustee alleges that Debtor failed to schedule or disclose income, several assets, the closed Edward Jones account and the transfer of the money to his mother.  The Trustee offered evidence in support of these allegations.  The question is whether this evidence is sufficient to meet his burden of proving each of the elements of his section 727(a)(4) cause of action.[4]

---

[4] As a threshold issue, Debtor argues that the Trustee is barred from bringing a cause of action under section 727 because he "elected his remedies" when he pursued a motion for turnover.  Debtor offered no authority suggesting that a trustee may not pursue a turnover motion against a third party in addition to seeking denial of a debtor's discharge.  Trustees often pursue multiple remedies like these in bankruptcy cases. The Court knows of no Bankruptcy Code provision barring a Trustee from pursuing both turnover and denial of discharge.  Without specific authority, the Court rejects this argument.

a.   <u>Statement under Oath</u>

A debtor's signature on the petition, made under penalty of perjury, is a

declaration which has the force and effect of an oath of the kind contemplated by

section 727(a)(4)(A).  <u>In re Charles</u>, 474 B.R. at 684 (citation omitted).  Debtor signed

the petition and testified under oath at the meeting of creditors.  Accordingly, the Court

finds that Debtor's statements at the meeting of creditors and the information in—and

omissions from—his schedules and SOFA are "statements under oath."  The Trustee

satisfied his burden of proof under the first element of section 727(a)(4).  <u>See</u> <u>In re</u>

<u>Freese</u>, 460 B.R. at 738–39.

b.   <u>False Statement that Debtor Knew Was False</u>

Debtor testified that he "spent quite a bit of time" reviewing the information in his

bankruptcy petition before he signed it.  He understood that he was required to disclose

all assets. Yet he filed inaccurate schedules and statements on July 5, 2017.  Debtor

omitted several assets from his schedules including a depth finder, trolling motor,

portable ice house, auger, golf cart and archery equipment.  He did not disclose his

employment as a fishing guide or the money Feldner owed to him at the time of petition.

He did not list his income from fishing tournaments.  In addition, he failed to disclose

that he liquidated the nonretirement Edward Jones account and transferred the money

to his mother.

Debtor knew about the omitted personal property.  Although he offered

explanations for why he overlooked or omitted the assets, he did not deny owning them

or knowing that he owned them on the petition date.

He also knew about the income he earned from fishing tournaments and guide

services.  His side jobs and income were contemporaneous with the filing of his

16

bankruptcy petition.  His suggestion that the details regarding prepetition earnings were jumbled together or that the information was not immediately available to him is unconvincing.  Debtor knew he was entitled to payments from fishing tournaments or guide services and should have investigated the details and fully disclosed them.

Lastly, Debtor liquidated the Edward Jones account and gave the money to his mother approximately one month before he filed his petition.  Debtor knew his mother deposited the proceeds in the Kirkwood Bank account because he used the debit card associated with the account to pay his living expenses days before and after the petition date.  He also knew that his mother used these funds to pay his bills.  Debtor explained his failure to disclose the Edward Jones account in his schedules and statements and at the meetings of creditors by saying he did not consider "cashing out" the account and giving the money to his mother to deposit into an account in her name "a transfer" and therefore did not disclose it as "a transfer."  This explanation does not excuse his failure to disclose the account as an asset on his schedules.  He knew that he owned the proceeds from the Edward Jones account and that the schedules and statements were incomplete without this account.  Accordingly, the Court finds that the Trustee met his burden of proving that Debtor made false statements he knew were false on the date he signed the petition and at his meeting of creditors.  See In re Freese, 460 B.R. at 738–739.

c.    Fraudulent Intent

Debtor claims that his failure to provide accurate information was inadvertent, unintentional and based on "nominal oversights."  He expressly denies that he made these misstatements or omissions with fraudulent intent.  The Trustee may establish fraudulent intent with direct or circumstantial evidence.  See In re Cecil, 542 B.R. at 451.

17

The Court regards assertions, whether statements or omissions, made with reckless indifference to the truth as intentionally false.  See id.

The Court finds that Debtor's reckless indifference to the truth and the circumstances of this case demonstrate that he acted with fraudulent intent related to his omissions and false statements regarding the money from the Edward Jones account.  Debtor closed the Edward Jones account on June 2, 2017, eleven days before a state court entered judgment against Debtor in the total sum of approximately $280,000, the timing of which raises the scepter of suspicion.  The fact that his mother deposited the money in an account in only her name supports the fraudulent inference. He did not disclose this account until after his attorney discovered unexplained interest on Debtor's tax return.  Although Debtor offered explanations for omitting the account or its proceeds on his schedules and statements, the Court does not find them convincing. Rather, the Court finds that Debtor intended to pay certain creditors at the expense of other creditors.

Debtor asserts that he provided documentation showing how he spent the funds he withdrew from the Edward Jones account.  He claims he used the money to pay legitimately due bills, negating a finding of fraudulent intent.  The court in Tow v. Henley (In re Henley), 480 B.R. 708 (Bankr. S.D. Tex. 2012), addressed a similar situation.  In In re Henley, the court found that the fact that the debtors paid some of their creditors with the proceeds from the sales of undisclosed assets "does little to mitigate the Debtors' intent to deceive" the trustee and their other creditors and did not negate the debtors' underlying fraudulent intent under section 727(a)(4).  Id. at 794.  It opined, "The Debtors' use of proceeds from the sale of undisclosed assets to pay their own expenses

18

and certain subcontractors is information that those creditors who received no payment should be entitled to know in evaluating whether to take action against the Debtors." Id. at 794 n.101.  The same is true in this case.  When Debtor petitioned for bankruptcy relief, he had the duty to honestly and accurately disclose all assets and transfers, and this duty was not obviated by paying favored creditors with the money from the Edward Jones account.

In addition, Debtor failed to disclose income generated from fishing tournaments and guide services and denied he was owed any money on the petition date.  Debtor later conceded that he was holding two guide checks on the date of petition and he did not disclose them.  These facts bolster the Court's finding of fraudulent intent under the circumstances of this case.

Similarly, Debtor's failure to disclose some of his assets shows reckless indifference for the truth.  Debtor explained at trial that he did not list a depth finder, a small portable ice house, an auger, a golf cart and archery equipment because he felt they had no value.  This explanation is not a persuasive defense.  A debtor must disclose all assets and transactions, even if the assets are worthless or unavailable to creditors. See United States v. Canine, 30 Fed. Appx. 678, 679 (8th Cir. 2002); Palatine Nat'l Bank of Palatine v. Olson (In re Olson), 916 F.2d 481, 484 (8th Cir. 1990); Fokkena v. Peterson (In re Peterson), 356 B.R. 468, 478 (Bankr. N.D. Iowa 2006). The Eighth Circuit Bankruptcy Appellate Panel explained:

> [D]ebtors are not free to pick and choose what to disclose, and what not to disclose.  Since the bankruptcy system depends on full disclosure, a discharge is properly denied where a debtor acts with reckless indifference in failing to list assets in which that debtor holds an interest. Here, whether these assets would have ultimately resulted in funds for creditors or not, the items the Debtor omitted from her schedules were not of trivial value.

In re Cecil, 542 B.R. at 454–55.  Therefore, even if the Court finds that the assets

Debtor failed to disclose were of nominal value, this finding would not negate

Debtor's duty to disclose.

Debtor next claims that his misrepresentations and omissions were the

result of oversight or misunderstanding of the disclosure requirements.  He argued

that he is "clueless" and his mother does everything for him, negating a finding of

fraudulent intent.  In a similar vein, he argues that the bankruptcy process is very

complicated and that people make mistakes.[5]

The Court is not persuaded.  "While courts are often understanding of a single

omission or error resulting from an innocent mistake, multiple inaccuracies or

falsehoods may rise to the level of reckless indifference to the truth which is the

functional equivalent of intent to deceive."  Horizon Fin'l Bank v. Borstad (In re Borstad),

550 B.R. 803, 833 (Bankr. D.N.D. 2016) (citations omitted).  In this regard, "the

existence of multiple falsehoods, taken together with a failure on the part of the debtor

to correct all known inconsistencies, omissions, and misstatements upon first

amendment, constitutes reckless indifference to the truth and, thus, the requisite intent

to deceive."  Id. at 833–34 (citing Kaler v. McLaren (In re McLaren), 236 B.R. 882, 895

(Bankr. D.N.D. 1999)).

---

[5] In his pretrial brief, Debtor asserts that he did not oppose a motion the Trustee
filed seeking turnover of funds from Debtor's mother, and this is "strong evidence
defeating the assertion of actual intent[.]"  Doc. 11, p. 11.  The Court is not persuaded.
Debtor's failure to object to this motion provides no information to the Court regarding
Debtor's intent to defraud.  Rather, it suggests to the Court that opposing the motion
would have been futile or a waste of resources.

Debtor's failure to disclose numerous assets and his false statements in this case show a reckless indifference to the truth and demonstrate Debtor's lack of "utmost honesty and candor" in completing or reviewing the filings.  See In re McLaren, 236 B.R. 894–95.  Given the number of omissions and the circumstances in this case, Debtor's claim that these omissions were unintentional oversights or the result of mistake or ignorance is not convincing.

Accordingly, the Court finds that the Trustee met his burden of showing, by a preponderance of the evidence, that Debtor acted with fraudulent intent.

d.   Materiality

A statement is material under 11 U.S.C. § 727(a)(4)(A) if it relates to or concerns the debtor's business transactions, the debtor's business or personal estate, the discovery of assets, or the existence or disposition of the debtor's property.  Merty v. Rott, 955 F.2d 596 (8th Cir. 1992); In re Grimlie, 439 B.R. 710, 717 (B.A.P. 8th Cir. 2010).  All of the omissions of the property interests or transactions from the initial schedules concerned Debtor's personal estate, the discovery of assets, the existence of Debtor's property and the disposition of Debtor's property.  Therefore, the omissions or misrepresentations in the initial schedules were material.  Accordingly, the Court holds that the Trustee met his burden of proof on each element of the section 727(a)(4)(A) claim.

The Court considered all of Debtor's other arguments related to the Trustee's section 727(a)(4)(A) cause of action and deems them to be without merit.

IV.   **CONCLUSION**

For the reasons stated above, Debtor's discharge is denied under 11 U.S.C. §727(a)(4)(A).  Because the Court denies Debtor's discharge under this section, the

Court finds it unnecessary to decide whether he should also be denied a discharge

under 11 U.S.C. § 727(a)(2).

**JUDGMENT MAY BE ENTERED ACCORDINGLY.**

Dated:  October 18, 2018.

SHON HASTINGS, JUDGE
UNITED STATES BANKRUPTCY COURT